En el Tribunal Supremo de Puerto Rico

| | |
|---|---|
| RAFAEL COLON PRIETO<br>      Demandante-Recurrido<br><br>    .V<br><br>WILFREDO A. GEIGEL<br><br>      Demandado-Recurrente | REVISION<br><br>98TSPR69 |

Número del Caso: RE-89-0096

Abogados Parte Recurrente: LCDO. BENITO I. RODRIGUEZ MASSO

Abogados Parte Recurrida: LCDO. SAMUEL TORRES CORTES

Tribunal de Instancia: Superior, Sala de San Juan

Juez del Tribunal de Primera Instancia: Hon. Wilfredo Alicea López

Fecha: 6/11/1998

Materia: Mala Práctica Legal

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Rafael Colón Prieto, por sí;
la Sociedad Legal de Gananciales
compuesta por Rafael Colón Prieto
y su esposa Nilda González Casañas,
por sí; María Dolores Colón
González y Rafael Colón González,
representados por su padre con
patria potestad, Rafael Colón
Prieto                                    RE-89-98      Revisión

    Demandantes-Recurridos

      v.

Wilfredo A. Géigel

    Demandado-Recurrente


SENTENCIA

San Juan, Puerto Rico a 11 de junio de 1998

Los demandantes-recurridos presentaron una causa de acción exigiéndole resarcimiento al abogado demandado por los daños que les causó su impericia profesional al provocar la desestimación y archivo del caso en el que reclamaban daños por impericia médica. (Colón Prieto v. Ark, CS-73-3814, Tribunal Superior, Sala de Mayagüez). Alegan que el Lcdo. Géigel negligentemente violó el deber de información y el deber de salvaguardar su derecho a apelar y que a causa de esta negligencia se vio malograda su reclamación de impericia médica contra el Dr. Phillip R. Ark. El antigüo Tribunal Superior, Sala de San Juan (Hon. Flavio E. Cumpiano), declaró con lugar la demanda y condenó al demandado a indemnizarle a los

demandantes $60,000.00 en daños con intereses al 11.5% desde la radicación de la demanda, las costas del procedimiento, más $8,000.00 por concepto de honorarios de abogado. De dicha sentencia recurrió ante nos el demandado, el Lcdo. Wilfredo A. Géigel, solicitándonos que la revoquemos por no existir prueba suficiente para sustentarla. Por entender que tiene razón el recurrente, revocamos.

Los hechos pertinentes a este caso son los siguientes. El 10 de noviembre de 1971, Rafael Colón Prieto fue sometido a una intervención por parte del cirujano dental, Dr. Phillip R. Ark, para extraerle cuatro (4) cordales impactados. Al despertarse de esta intervención, el Sr. Colón Prieto percibió que estaba sangrando y que tenía una herida en la lengua que le producía una sensación de ardor, quemadura intensa e insensibilidad. Esa noche el Dr. Ark lo examinó y le indicó que la herida era resultado de una mordida autoinfligida mientras se encontraba bajo los efectos de la anestesia y que los síntomas eran consecuencias normales de la intervención y desaparecerían con el tiempo. No obstante, el tiempo pasó pero el dolor agudo continuó, a consecuencia de lo cual se vieron afectadas las actividades ordinarias del Sr. Colón Prieto y de sus familiares.

Tras varias visitas a la oficina del Dr. Ark para darle seguimiento a los síntomas que había desarrollado, en marzo de 1972, el Dr. Ark le informó al Sr. Colón Prieto que de persistir los síntomas sería necesario cortarle un pedazo de la lengua. Inconforme con este diagnóstico, el Sr. Colón Prieto decidió acudir a otro cirujano dental, quien a su vez lo refirió al neurocirujano Max Ramírez de Arellano. Luego de realizar los estudios pertinentes, el 10 de noviembre de 1972, este último concluyó que la lesión sufrida por el Sr. Colón Prieto no fue causada por una mordida autoinfligida, sino por una cortadura o cercenación del nervio lingual derecho. Como resultado, el 10 de septiembre de 1973, el Sr. Colón Prieto, su esposa y sus hijos presentaron demanda por impericia médica contra el Dr. Ark.

Estando pendiente este caso ante el antigüo Tribunal Superior, Sala de Mayagüez, la representación legal del Sr. Colón Prieto renunció y fue sustituida por el Lcdo. Géigel, aquí demandado. Los trámites en el caso continuaron y se señaló la vista en su fondo para el 18 de abril de 1978. Esta vista luego fue pospuesta por acuerdo de las partes y con el visto bueno del Juez Superior Juan E. Lugo Rodríguez, con el propósito de dilucidar la defensa de prescripción que había sido levantada por la parte demandada. Sin embargo, llegado el día de la vista que había sido pospuesta, ante la incomparecencia de las partes, otro juez ajeno al acuerdo de posposición dispuso el archivo de la demanda e impuso a los abogados una sanción económica para beneficio del Estado. Como resultado, el Lcdo. Géigel presentó un total de siete (7) mociones objetando la sanción impuesta y solicitando que se dejara sin efecto la sentencia dictada, pero en ninguna tuvo éxito. Tampoco solicitó revisión de estas resoluciones ante este tribunal apelativo ni le informó a su cliente, el Sr. Colón Prieto, que su causa de acción había sido desestimada.

Al advenir en conocimiento de que su demanda había sido archivada y de que el período para solicitar revisión de la sentencia de archivo ya había transcurrido, el Sr. Colón Prieto, su esposa y sus hijos presentaron demanda por mala práctica legal contra el Lcdo. Géigel ante el antiguo Tribunal Superior, Sala de San Juan, alegando que a causa de la negligencia de éste habían perdido su causa de acción contra el Dr. Ark. Previo ciertos trámites de rigor, la Sala de San Juan desestimó sumariamente la demanda al resolver que la reclamación contra el Dr. Ark estaba prescrita y que, por tanto, la reclamación contra el Lcdo. Géigel no tenía posibilidades de prevalecer. Además, resolvió que el Lcdo. Géigel había sido diligente en la tramitación del pleito, ya que solicitó que se dejara sin efecto la sentencia presentando múltiples mociones. De dicha determinación del tribunal de instancia acudió ante nos el demandante presentando solicitud de Certiorari.

El 29 de marzo de 1984, revocamos la sentencia dictada por el tribunal de instancia y resolvimos que la reclamación contra el Dr. Ark no estaba prescrita. Además, aclaramos la diferencia entre la facultad que tiene un abogado para decidir si apela las determinaciones de un tribunal y su obligación de salvaguardar el derecho de apelar de su cliente, y emitimos una orden de continuar los procedimientos ante el Tribunal Superior para que se determinara si el abogado demandado incurrió en mala práctica profesional. También establecimos que al igual que en todo caso de daños y perjuicios contra un profesional, para que proceda una causa de acción por mala práctica de un abogado bajo el artículo 1802 del Código Civil, 31 L.P.R.A. § 5141, es necesario que se configuren los siguientes elementos básicos:

1. la existencia de una relación de abogado-cliente que genere un deber;

2. que el abogado, por acción u omisión, viole ese deber;

3. que esa violación sea la causa próxima del daño al cliente; y

4. que el cliente, como reclamante, sufra un daño o pérdida.

Colón Prieto v. Géigel, 115 D.P.R. 232 (1984).

Una vez abiertas las vías forenses nuevamente, el tribunal de instancia procedió a fraccionar el pleito, juzgando primeramente el aspecto sobre la responsabilidad del Lcdo. Géigel. En esta primera etapa el tribunal dictó sentencia en la cual determinó que entre los demandantes y el demandado existía una relación de abogado-cliente, mediante la cual los demandantes le encomendaron al demandado la representación legal de sus derechos en la reclamación por impericia médica contra el Dr. Ark. Esta relación generó para el Lcdo. Géigel la obligación de cumplir con los deberes que le impone el Código de Etica Profesional, 4 L.P.R.A. Ap. IX, particularmente aquellos deberes del abogado para con su cliente. La sentencia también estableció que el letrado faltó a varios de estos deberes. Primero, violó el deber de mantener informado a su cliente, Canon 19, porque no le informó al demandante que se había archivado su demanda contra el Dr. Ark. Segundo,

violó el principio de diligencia del Canon 18 porque no informó ni instruyó a su cliente sobre los derechos de apelación que podría tener respecto a dicha sentencia de archivo, ni recurrió por su propia cuenta ante este tribunal. Finalmente, resolvió que el Lcdo. Géigel vendría obligado a indemnizar a los demandantes si en la segunda etapa del pleito se demostraba que tal conducta

culposa les había causado daños.[1]

En la segunda etapa del pleito el tribunal de instancia concluyó que a no ser por la mala práctica legal del Lcdo. Géigel, la reclamación de los demandantes contra el Dr. Ark hubiera prosperado. Determinó que el Dr. Ark operó al Sr. Colón Prieto sin haber obtenido su consentimiento informado; que fue negligente al no recomendarle a tiempo que visitara a un neurocirujano; y que por su negligencia durante la extracción de los cordales le cercenó el nervio lingual derecho. Como resultado de ello, condenó al Lcdo. Géigel a compensarle a los demandantes los daños que le causó el Dr. Ark con su impericia médica. Es de esta sentencia que recurre ante nos el Lcdo. Géigel solicitándonos que dejemos sin efecto las determinaciones del tribunal de instancia.

II

El recurrente sostiene que erró el tribunal de instancia al concluir que no obtuvo el consentimiento informado del Sr. Colón Prieto. En primer lugar, señala que el tribunal no debió admitir evidencia sobre la falta de un consentimiento informado y que dicha admisión errónea fue un factor decisivo en la determinación a la que llegó el tribunal. Arguye que ni en la demanda original presentada contra el Dr. Ark ni en momento alguno antes del día del juicio en el caso por mala práctica legal, se solicitó enmienda alguna a las alegaciones para incluir una reclamación por falta de consentimiento informado. Asimismo, alega que al momento de presentarse dicha evidencia el día del juicio, la misma fue objetada rigurosamente por el fundamento de que era ajena a las

---

[1] Esta sentencia advino final y firme sin que sus determinaciones fueran cuestionadas por ninguna de las partes.

alegaciones hechas por las partes. Finalmente, sostiene que al admitir dicha evidencia, el tribunal le causó un perjuicio sustancial porque añadió una controversia al pleito. Siendo ello así, expone que no podía el tribunal de instancia admitir la misma ni ordenar que se compensaran los daños alegadamente causados por la falta de consentimiento informado.

Luego de revisar el expediente en el caso de Colón Prieto v. Ark, Caso Civil Núm. CS-73-3814, y de examinar las transcripciones de evidencia del caso de Colón Prieto v. Géigel, Caso Civil Núm. 79-2460, concluimos que el recurrente no tiene razón. Es cierto que en ninguna de las alegaciones de la demanda contra el Dr. Ark se plantea la existencia de una controversia relacionada con el consentimiento prestado por el Sr. Colón Prieto para someterse a la operación por la que se reclama. Tampoco surge de los autos del caso que luego de la presentación de la demanda y dentro del término para solicitar enmiendas a las alegaciones la parte recurrida haya intentado incluir una reclamación al respecto. Sin embargo, en este caso hubo una enmienda implícita a las alegaciones conforme a la Regla 13.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III R. 13.2.

En Vélez Torres v. Latimer, 125 D.P.R. 109, 111 (1990), indicamos que el propósito de las alegaciones es bosquejar a grandes rasgos todas las controversias planteadas en un caso, de modo que la parte contraria sea notificada de las contenciones y reclamaciones que se presentan en su contra para que pueda comparecer a defenderse de lo que se le reclama. No obstante, aun cuando no se incluyan todas las reclamaciones en las alegaciones, la Regla 13.2 permite que éstas queden enmendadas por la prueba al momento del juicio si la parte contra quien se presenta consiente a ello expresa o implícitamente o si el tribunal así lo autoriza.

Surge de la misma regla que el consentimiento implícito para enmendar las alegaciones se obtiene cuando la parte contra quien se presenta la evidencia que resulta ajena a las alegaciones, no objeta la presentación de la misma. Pero cuando el ofrecimiento o presentación de

tal evidencia es objetado, el tribunal sólo autorizará la enmienda a los fines de que se facilite la presentación del caso si determina que la parte que se opone no habrá de sufrir perjuicio en su reclamación o defensa. Por el contrario, si determina que dicha parte habrá de sufrir tal perjuicio, deberá rechazar la evidencia o podrá conceder una posposición para permitir a la parte opositora controvertir la misma.

En el caso de autos, el recurrente señala que al ofrecerse el testimonio del Dr. Martin Stern, objetó rigurosamente a su admisibilidad porque el mismo estaba relacionado únicamente al asunto de consentimiento informado.[2] Pero antes de que testificara el Dr. Stern, el demandante había testificado sobre la información que le brindó el Dr. Ark en cuanto a los riesgos y consecuencias de la operación de los cordales. (Transcripción de evidencia de la vista celebrada el 8 de septiembre de 1987, páginas 21 a la 23). Ante este testimonio, el abogado del demandado sólo levantó una objeción por el fundamento de que el testimonio constituía prueba de referencia. En ningún momento adujo como fundamento para su objeción que el testimonio trataba sobre prueba ajena a las alegaciones. <u>Por tanto, prestó su consentimiento implícito a que se enmendaran las alegaciones para incluir una reclamación por falta de consentimiento informado.</u>

En segundo lugar, el recurrente señala que aun si la evidencia sobre la falta de un consentimiento informado fue correctamente admitida, el tribunal erró en la aplicación del derecho. La doctrina de consentimiento informado le impone al médico el deber de informarle a su paciente sobre la naturaleza y riesgos del tratamiento médico que le

---

[2] La parte demandada también objetó a la presentación de dicho testimonio porque la parte demandante no suplementó su contestación a los interrogatorios para notificarle al demandado que había contratado al perito. También objetó porque, aun si dicho perito había hecho una determinación de negligencia, la misma fue muchos años después de los hechos. Dicha objeción fue declarada sin lugar por el Tribunal Superior porque más de dos años antes de la vista, los demandantes presentaron una moción ante el tribunal informándole que se había contratado al Dr. Stern para que fuera perito en el caso. Nos parece que esta determinación fue acertada porque la moción presentada por los demandantes cumplió con el propósito de informarle al demandado quiénes serían peritos en el caso, además de que entendemos que el momento en que fue contratado el perito, si bien podría afectar la credibilidad de su testimonio, no incide sobre su admisibilidad.

propone, de manera que el paciente se encuentre en una posición adecuada para tomar una decisión inteligente e informada. Al discutir las exigencias de dicha doctrina, en Rodríguez Crespo v. Hernández, 121 D.P.R. 639 (1988), y en Sepúlveda v. Barreto, 94 JTS 158, opinión del 23 de diciembre de 1994, resolvimos que el médico debe d previsibles, así como los beneficios del tratamiento propuesto, las consecuencias probables de no someterse al mismo y las alternativas disponibles. No tiene que revelarle riesgos remotos o aquellos riesgos que razonablemente no pueda prever.

La prueba presentada en este caso demuestra que al obtener el consentimiento del Sr. Colón Prieto, el Dr. Ark no le reveló la existencia de un riesgo de que durante la extracción de los cordales se le cercenara el nervio lingual, a pesar de que dicho riesgo era completamente previsible y de que la práctica prevaleciente de la profesión exigía su revelación. Dicha omisión constituyó una violación a las normas de consentimiento informado. Sin embargo, no fue suficiente para imponer responsabilidad civil. En casos en que se reclamen daños por la falta de un consentimiento informado, el artículo 1802 del Código Civil, 31 L.P.R.A. § 5141, exige que, además de demostrar que ha habido un daño y un incumplimiento con el deber de informar, el demandante pruebe que dicho incumplimiento fue lo que le causó el daño. Para demostrar este elemento de causalidad, el demandante tiene que colocar al tribunal en una posición que le permita determinar si en el curso normal de los acontecimientos le era exigible al doctor prever que la falta de información debida llevaría a su paciente a adoptar una decisión distinta a la que tomaría de haber estado adecuadamente informado. Sepúlveda v. Barreto, supra a la pág. 548. Es decir, que en casos como el de autos, donde el consentimiento se estaba solicitando para someter al paciente a una operación para removerle los cordales, el demandante tiene que presentar evidencia que permita al tribunal evaluar cómo se hubiera afectado su decisión de haber conocido el riesgo que no le fue informado y si dicho efecto era previsible desde el punto de vista

de su dentista. El demandante en este caso no aportó dicha prueba. De hecho, el Sr. Colón Prieto ni siquiera alegó (mucho menos probó) que si hubiera conocido este riesgo no hubiera consentido a la operación. Por tanto, no podemos confirmar la determinación del tribunal de instancia que ordenó al demandado a compensarle a los demandantes los daños que les causó la falta de un consentimiento informado.

III

En la sentencia impugnada por el recurrente, el tribunal de instancia determinó que la sintomatología de la que se queja el demandante es resultado de la laceración que sufrió en la lengua, que ésta se la ocasionó el Dr. Ark mientras le extraía los cordales y que "evidentemente" el doctor no ejerció el grado de cuidado, las destrezas y previsiones que la operación exigía porque no es usual que en este tipo de operación se ocasionen daños al nervio lingual.

No podemos estar de acuerdo con la inferencia a la que llega el tribunal de instancia. El artículo 1802, *supra*, le exige a los dentistas las mismas normas mínimas de cuidado, de conocimiento y destrezas que le exige al resto de la profesión médica. Por tanto, la atención que se les requiere es aquella que, a la luz de los modernos medios de comunicación y enseñanza, y conforme a los conocimientos de la ciencia y prácticas prevalecientes en la comunidad médica, satisface las exigencias que la propia profesión ha establecido para el tratamiento de enfermedades iguales o parecidas. Rodríguez Crespo v. Hernández, *supra*, Medina Santiago v. Vélez, 120 D.P.R. 380 (1988), Pérez Torres v. Bladuell Ramos, 120 D.P.R. 295 (1988), Ríos Ruiz v. Mark, 119 D.P.R. 816 (1987) y Oliveros v. Abréu, 101 D.P.R. 209 (1973). También se exige del dentista que al atender a sus pacientes aplique sus conocimientos y destrezas con el grado de cuidado que se espera ejerza un profesional con su misma preparación. Medina Santiago v. Vélez, supra.

Al igual que con los demás médicos, al dentista le cobija una presunción de que administró el tratamiento adecuado a su paciente, por lo que le corresponde al demandante presentar evidencia suficiente para

demostrar lo contrario. Medina Santiago v. Vélez, supra, Sáez v. Municipio de Ponce, 84 D.P.R. 535 (1962), Ramos Orengo v. La Capital, 88 D.P.R. 315 (1963). Ello requiere que la relación de causalidad y la determinación de negligencia no se establezcan a base de meras especulaciones o conjeturas. La negligencia del médico tampoco se puede presumir por el mero hecho de que el paciente haya sufrido un daño o porque el tratamiento no haya tenido éxito. El demandante tiene que establecer mediante la preponderancia de la evidencia que el daño ocurrido se debió con mayores probabilidades a la negligencia del demandado. Para ello, tiene que presentar prueba pericial sobre las normas mínimas de conocimiento y cuidado médico aplicables a esta rama de la medicina; tiene que demostrar que el demandado incumplió con estas normas en el tratamiento del paciente; y demostrar que dicho incumplimiento fue la causa de la lesión que sufrió. Rodríguez Crespo v. Hernández, supra, Medina Santiago v. Vélez, supra. Esta prueba podrá obviarla sólo cuando la falta de cuidado sea tan evidente como para inferir negligencia. Quiñones v. Duarte Mendoza, 112 D.P.R. 223 (1982).

Un análisis cuidadoso de la transcripción de evidencia revela que los demandantes no aportaron la evidencia necesaria para probar que el Dr. Ark incurrió en negligencia al extraerle los cordales al Sr. Colón Prieto. Tampoco surgen circunstancias que nos permitan obviar la presentación de evidencia sobre la negligencia del Dr. Ark. De hecho, el propio perito de los demandantes, el Dr. Martin Stern, aceptó que la extracción se hizo bajo métodos aceptables y que, a pesar de que el nervio no debía lacerarse porque había un diente presente, podía ocurrir aun en las manos más expertas. (Transcripción de evidencia a las págs. 242-243 y 269).

II

En cuanto a la negligencia post-operatoria, la prueba sí estableció que el Dr. Ark debió haberle indicado al Sr. Colón Prieto que había sufrido una laceración en la lengua y que era recomendable que visitara a un neurocirujano. Al no hacerlo se apartó de las normas exigibles a un

dentista. (Transcripción de la evidencia a las págs. 227, 238, 246-247 y 271). Sin embargo, no se estableció el nexo de causalidad entre dicha negligencia y los daños que sufrió y continúa sufriendo el Sr. Colón Prieto.

Según la evidencia aportada, cuando ocurre este tipo de laceración la práctica prevaleciente es esperar de seis meses a un año antes de hacer intentos por reparar el nervio lingual, porque generalmente el problema se corrige con el paso del tiempo. Es luego de este período que, si la condición persiste, interviene un neurocirujano para tratar de reparar el nervio. En el caso que nos ocupa, la prueba demostró que dentro de este período de seis (6) meses a un (1) año el Sr. Colón Prieto visitó a un especialista en cirugía oral por su propia cuenta. Tal como indica el testimonio del Dr. Stern, a pesar de que el Dr. Ark fue negligente al no referirle a un especialista, "el [sic] paciente de una manera u otra se le estaban [sic] viendo por el problema", por lo que no existe causalidad entre la omisión negligente del doctor y los daños que sufre el Señor Colón Prieto. (Transcripción de evidencia a la pág. 247).

Habiendo determinado que no se estableció responsabilidad alguna por parte del Dr. Ark frente al Sr. Colón Prieto y sus familiares, no podemos confirmar la sentencia del antiguo Tribunal Superior que condenó al Lcdo. Géigel a indemnizar a los demandantes. Procede, pues, la revocación de la sentencia dictada por el ilustrado tribunal de instancia.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Negrón García emitió opinión disidente. Los Jueces Asociados señores Fuster Berlingeri y Corrada del Río disintieron sin opinión escrita.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Rafael Colón Prieto,
et als.
  Demandantes-Recurridos

              v.

                                    RE-89-96      Revisión

Wilfredo A. Géigel


    Demandado-Recurrente



          Opinión Disidente del Juez Asociado señor Negrón García



          San Juan, Puerto Rico, a 11 de junio de 1998

          **Constituye una nota irónica que hiere nuestra conciencia judicial**, que hoy la Sentencia mayoritaria favorezca al Lcdo. Wilfredo A. Géigel, quien como abogado de Rafael Colón Prieto ayer asumió una postulación totalmente **contraria, a saber, que el Dr. Ralph Ark negligentemente le cortó el nervio lingual**. Parafraseando la clásica aseveración de que **justicia tardía no es justicia**, resumimos así nuestra insatisfacción: **injusticia tardía es doble injusticia**.

          No podemos suscribir que **un cuarto de siglo después**, sin fundamentos válidos, se exonere de responsabilidad civil **por mala práctica (negligencia) profesional** al Dr. Ark y al Lcdo. Géigel. La propia

Sentencia mayoritaria reconoce que el Dr. Ark **omitió explicarle** a su paciente Colón Prieto el riesgo de laceración del nervio lingual que conllevaba extraerle los cuatro cordales bajo **anestesia general**, **infringiendo así el principio de consentimiento informado**; que efectivamente, el 10 de noviembre de 1971, el Dr. Ark **le cercenó a nivel de los cordales el nervio arveolar del lado izquierdo**, causándole una **insensibilidad permanente** en la lengua que le ha producido innumerables mordidas y heridas sangrantes, constante sensación de quemazón, incomodidad, mala alimentación, insomnio crónico, depresión, y otros daños más; que el Dr. Ark fue advertido de la situación ese mismo día y desde ese momento, **por más de un año, le ocultó a Colón Prieto la verdadera causa, gravedad y consecuencias de la lesión, demorando así que éste acudiera a tiempo a tratarse con otros especialistas para remediar el daño principal y mitigar sus males secundarios.**

**Decimos injusticia doble**, pues en virtud de las conclusiones erróneas mayoritarias, se libera de responsabilidad al Lcdo. Géigel, aún cuando la Sentencia también acepta –con carácter final y firme–, que **negligentemente dicho abogado incumplió con el principio de información y deber de diligencia** en torno al archivo de la demanda original de Colón Prieto contra el Dr. Ark presentada el 10 de septiembre de 1973. (Civil Núm. 73-3814).

La **injusta Sentencia mayoritaria relaja los criterios de excelencia profesional médica y legal a unos niveles inimaginables. Bajo sus parámetros, resulta sumamente difícil, sino imposible demostrar la responsabilidad de un médico o abogado, por impericia o descuido profesional.**

Expongamos sucintamente los hechos según el elaborado dictamen del Tribunal Superior, Sala de San Juan (Hon. Wilfredo Alicea López), avalados en una reflexiva aquilatación y esmerado análisis de la prueba testifical y documental.

I

Colón Prieto padecía de cuatro (4) cordales impactados. El 28 de octubre de 1971, el cirujano dental Dr. Ark le recomendó operárselos. Fue advertido de que después de la operación tendría dolor temporal, se iba a hinchar y pondría trinco, pero que en dos o tres días estaría bien. Colón Prieto accedió.

Bajo **anestesia general**, la operación se realizó el 10 de noviembre en el Hospital La Concepción de Mayagüez. Colón Prieto despertó y recobró totalmente conciencia a las 4:00 P.M. Tenía dolor en el área de los cordales, estaba bien hinchado, sentía tirantez en la barbilla izquierda, la cara trinca; y **sufría una sensación de quemadura en el lado derecho de la lengua.** Se levantó, fue al baño y al mirarse la lengua, se percató que **tenía una laceración en el lado derecho que le ardía mucho y medía como tres cuartos de pulgada (3/4) de largo.**

Esa noche le relató al Dr. Ark esas dolencias **y le mostró la laceración en la lengua.** El Dr. Ark le dijo que posiblemente se había mordido la lengua, pero que ello pasaría; le recetó Demerol. Al otro día, Colón Prieto reiteró esas dolencias y el Dr. Ark le indicó que con el tiempo desaparecerían.

El 13 de noviembre lo dio de alta y para removerle los puntos lo citó a su oficina. Así lo hizo el día 17. Durante este período, la inflamación y el dolor en el área de los cordales disminuyeron, pero no el problema de la barbilla y lengua. **Tenía la lengua inflamada e insensible, la herida abierta; al morderse, sangraba.** El Dr. Ark le dijo que había que esperar. No le recetó ningún medicamento y lo citó para el 30 de noviembre. Entre estas fechas, se le alivió la hinchazón y ya no estaba trinco. **Sin embargo, continuó la tirantez e insensibilidad en el lado izquierdo de la barbilla.** La mayor molestia y dolores lo producían la insensibilidad en la lengua, pues se mordía y abría la herida. **Para ese entonces comenzó a padecer y se le desarrolló un problema serio de insomnio.**

El día 30, el Dr. Ark le recetó cápsulas de Nembutal para dormir y pastillas de Dilantin para el ardor de la lengua. Fijó la próxima cita

para el 14 de diciembre. Subsistieron los mismos problemas: **los medicamentos no produjeron ninguna mejoría**. Para el 14 de diciembre, los cordales habían cicatrizado bien, pero el problema de la lengua persistía. El Dr. Ark no le recetó nada y lo citó para el 13 de enero de 1972. El insomnio se le agudizó y despertó varias veces con la lengua mordida. Al 13 de enero seguía con la insensibilidad en la lengua. El Dr. Ark le recetó Oretin para ver si le ayudaba a crecer el nervio de la mandíbula; para el problema de la lengua no le recetó nada y le dijo que tenía que esperar. La cita para febrero fue cancelada por Colón Prieto y transferida para el 15 de marzo. **Ésta fue la última cita de Colón Prieto como paciente del Dr. Ark.** Otra vez le relató el mismo problema de la lengua: insensibilidad con sensación de quemadura. El Dr. Ark le dijo que esperara cuatro (4) meses, y si continuaba igual, **volviera para cortarle ese pedazo de la lengua. Para ese entonces, el insomnio era crónico y continuaba mordiéndose.**[3]

Transcurrieron once (11) meses desde la operación –incluyendo los cuatro (4) meses recomendados por el Dr. Ark–, y Colón Prieto **seguía igual**. Ante el temor real de que el Dr. Ark le cortara un pedazo de la lengua, el 13 de octubre de 1972, por propia iniciativa acudió donde el **dentista**[4] Ricardo Pesquera. Luego de realizarle un historial y examinar unas placas que le envió el Dr. Ark con una carta explicativa, el 31 de octubre lo refirió al **especialista** Dr. Max Ramírez de Arellano, cirujano neurológico. El 10 de noviembre –**al año exacto de la operación**–, el Dr. Ramírez de Arellano lo examinó y le rindió un informe al Dr. Pesquera. Días después, el Dr. Pesquera le recetó vitamina B-12 y le dijo que no podía hacer ninguna intervención quirúrgica.

---

[3] Debido a este problema de salud y a los insomnios, Colón Prieto asistió poco al trabajo. Ello generó fricciones con su socio quien le dijo que no volviera a trabajar.

[4] La evidencia en autos identifica al Dr. Pesquera simplemente como dentista, **no especialista**.

Las vitaminas recetadas por el Dr. Pesquera no dieron resultado. A sugerencias del propio Colón Prieto, el Dr. Pesquera lo refirió al Dr. Rafael Longo, neurocirujano. Éste, en cita del 24 de noviembre lo examinó y recetó Protamide y vitaminas B-12; dichos medicamentos no le mejoraron. Después, fue evaluado por el neurocirujano Dr. Nathan Rifkinson, quien le hizo una evaluación neurológica similar a las de los galenos Ramírez de Arellano y Longo. Le recetó pastillas Mysoline pero tampoco dieron resultados positivos.

El Dr. Pesquera lo refirió al otorrinolaringólogo Dr. Juan H. Font quien le recetó Noctec y Tegretal, sin éxito.

Para el 12 de julio de 1973 el Dr. Pesquera le hizo cita con el Dr. Carlos Valls, cirujano oral, quien lo examinó pero no le recetó. El 26 de septiembre de 1973 visitó el Dr. Marcos A. Dones, cirujano oral en el Hospital Presbiteriano. Dicho médico llegó a la conclusión de que con cirugía no había nada que hacer. Le recetó Kemplex en inyecciones, pero no dieron resultado positivo.

Para el año 1974, el Dr. Pesquera y Colón Prieto concluyeron que habían agotado todas las alternativas en Puerto Rico y decidieron acudir a otros profesionales en los Estados Unidos.[5] Después de veinticinco

---

[5] El primero fue el Dr. Alex M. Mohnac, Jefe de Departamento de Dentistería, Temple University. Fue examinado el 14 de abril de 1974 por el Dr. Mohnac y tres médicos más. Le recetó Mincoplex y prescribió un tratamiento de dos meses, pero el mismo no le dio resultados positivos. Después, el Dr. Pesquera le consiguió cita con el Dr. Donald Mulder, Pres. Staff, Clínica Mayo de N.Y. para el 6 de mayo de 1975. El Dr. Mulder lo refirió al Dr. Stanley Lovestedt, cirujano oral. Éste lo examinó y no le recetó nada porque halló que no había forma alguna de corregir su condición de la lengua. El 9 de mayo, el Dr. Mulder concluyó que no había medicina ni cirugía alguna correctiva.

Nuevamente Colón Prieto obtuvo una cita con el Dr. Eugene D. Lyon, Jefe Depto., Hospital John Hophins para el 30 de mayo de 1975. En el ínterin, el 9 de abril de 1975, el Dr. Valls le recetó vitamina C, pastillas para dormir y Valium. En la cita con el Dr. Lyon, le tomaron placas y previo examen; éste coincidió con los médicos anteriores y no le recetó nada.

Subsiguientemente vio al Dr. Walter Guralenick, cirujano oral el 9 de junio de 1975 en el Mass. General Hospital, Boston. **Llegó a las mismas conclusiones.** También recibió tratamientos los días 4, 5, 11 y 12 de junio de 1975, sin mejoría, en el Depto. de Acupuntura del Hospital de Philadelphia.

(25) años de la operación y de haber consultado a muchos médicos, incluso cirujanos orales, el problema de la lengua persiste y ha desarrollado una fibrosidad.

Antes de la operación, Colón Prieto y su esposa Nilda González Casañas llevaban una vida normal, compartían la misma habitación, salían con amistades, pasaban fines de semana en San Juan con sus familiares, iban al teatro en San Juan, etc. Luego de la operación, el matrimonio no comparte la misma habitación, pues duermen en camas separadas por el problema del insomnio. Consume los alimentos solo para no distraerse y morderse la lengua. Se levanta y desayuna tarde, se siente de mal humor, se pone violento, aborrecido, sus hijos le molestan, han surgido problemas y disgustos en su casa, ya no comparten socialmente. Los viajes a San Juan se acabaron, hay tristeza en el hogar, no hay la unión y paz familiar de antes.

II

Distinto al criterio mayoritario, la responsabilidad profesional del Dr. Ark y, en consecuencia del Lcdo. Géigel, se impone bajo tres (3) distintos y separables fundamentos. Expongámoslos.

A. <u>Falta de Consentimiento Informado</u>:-

Correctamente la **Sentencia** mayoritaria concluye que la prueba enmendó las alegaciones de la demanda

---

En el año 1976, el Dr. Pesquera consultó el caso con otros cirujanos orales prominentes: Dr. Spatz, Jefe Depto. de Dentistería de la Univ. De Pittsburg, Dr. Daniel E. Waite, cirujano oral Univ. De Minnesota, y Dr. Wendell E. Bell, cirujano oral Univ. de Texas. **Todos contestaron; los resultados fueron negativos**.

En 1978 Colón Prieto fue a la Clínica Mayo y fue examinado por el Dr. Lofler, cirujano oral. Le dijo que no podía hacer nada. En 1985 volvió a dicha Clínica el Dr. Don Tollman le indicó que nada podía hacerse. Consultó además, al Dr. Hoffman en dicha clínica y éste lo refirió al **Pain Center**. Fue hospitalizado en **Sleep Disorder Center** del Hospital Saint Mary, bajo el cuidado del Dr. Richard Son. Le recetó Pretictelina, sin resultado. También fue referido al Depto. de Sicología y atendido por el Sicólogo Schwartz, cuyo tratamiento tampoco le dio resultado.

En Puerto Rico, el Dr. H. Mercado le recetó Dilantin para el problema de la lengua, pero no le alivió el dolor. En noviembre de 1985 fue a New York y se entrevistó con el Dr. Martin Stern, Jefe Cirugía Oral, Univ. de N.Y.

al respecto. (Págs. 8-9). Además, que se demostró que el Dr. Ark no le reveló a Colón Prieto la existencia del riesgo de que durante la extracción podía cercenarle el nervio lingual, a pesar de que dicho riesgo era completamente previsible y la buena práctica prevaleciente profesional así lo exigía. "Dicha omisión constituyó una violación a las normas de consentimiento informado." (Pág. 9).

Sin embargo, la **Sentencia** mayoritaria resuelve que Colón Prieto no demostró causalidad. Aduce que tenía que presentar prueba de cómo se hubiera afectado su decisión de haber conocido el riesgo, cosa que no hizo. (Pág. 10). **Discrepamos.**

Sobre este extremo, debemos aclarar que los autos originales del caso inicial, (Civil Núm. 73-3814, Colón Prieto v. Ark), fueron objeto de discusión en **conferencia con antelación al juicio** en el caso **que ahora nos ocupa**, Civil Núm. 79-2460, Colón Prieto v. Géigel. Celebrada por los abogados el 6 de abril de 1981, conforme su **Acta**, **éstos convinieron la admisibilidad de aquellos autos originales, "incluyendo interrogatorios y admisiones"**. Subsiguientemente, durante el juicio el 4 de marzo de 1987, **presentaron formalmente esos autos originales en evidencia**. (Exh. I, ambas partes). Entre los **interrogatorios** aludidos, cabe destacar la contestación núm. 37 de Colón Prieto, en la cual – luego de reiterar que el Dr. Ark no le advirtió que la remoción de los cordales podía ocasionarle un daño al nervio–, consignó que de haberlo hecho, **"nunca me hubiese decidido a operarme en ese mismo momento, al contrario, le hubiese pedido tiempo al Dr. Ark para considerarlo y hubiese acudido a otros especialistas. Es obvio que de haberme advertido de que él podía ocasionarme una lesión de tales consecuencias, yo nunca me hubiese operado de los cordales con el Dr. Ark."** (A.O., 69).

**Es incorrecta pues, la conclusión mayoritaria sobre ausencia de esa prueba.** Bajo los lineamientos jurisprudenciales recogidos en Sepúlveda v. Barreto, res. en 23 de diciembre de 1994, se demostró satisfactoriamente el elemento de "causalidad adecuada" entre la

omisión informativa del Dr. Ark y el daño sufrido por **falta de consentimiento informado** de Colón Prieto.

B. Negligencia Durante la Operación:-

En cuanto a la operación en sí, la Sentencia mayoritaria sostiene que Colón Prieto, "no aport[ó] evidencia necesaria para probar que el Dr. Ark incurrió en negligencia al extraerle los cordales..." (Pág. 12). Inmediatamente afirma que, "tampoco **surgen circunstancias que nos permitan** obviar la presentación de evidencia sobre la negligencia del Dr. Ark". **Ambas conclusiones son totalmente erróneas.**

**Primero**, la mayoría **ignora** el testimonio no contradicho del cualificado perito neurólogo Dr. Boris Rojas Rodríguez, quien contundentemente estableció **que el evento que con mayor probabilidad causó la lesión al nervio arveolar fue "la cirugía de los cordales".** (T.E., 90-92; 154-156; 159). Dicho perito descartó, por ser físicamente imposible, esto es **increíble, la versión de mordida auto infligida** promovida desde el principio por el Dr. Ark. Como explicó el Dr. Rojas Rodríguez, **por estar el nervio lingual atrás**, "tendría que morderse un sitio que ningún ser humano podía morderse". (T.E., 172).

Esa prueba, unida al testimonio pericial del Dr. Martin Stern (T.E., 239) –que le mereció enteró crédito al ilustrado Tribunal de instancia–, estableció concluyentemente que toda la sintomatología que ha aquejado a Colón Prieto desde la operación provino de la laceración de la lengua ocasionada por las manos del Dr. Ark mientras le extraía los cordales bajo anestesia total.

La Sentencia mayoritaria trata de refutar esta realidad enfatizando que en su testimonio el Dr. Stern contestó que la laceración "podía ocurrir aun en las manos más expertas". (T.E., 242, 243; 269). **El argumento no es persuasivo.** Olvida que aun las manos "más expertas" de un cirujano pueden ser descuidadas y, ciertamente, no se probó que las del Dr. Ark fueran de aquellas cualidades.

Nuestra jurisprudencia sobre impericia médica sólo exige que el actor demuestre, mediante preponderancia de prueba, que la conducta

negligente del demandado fue el factor que con **mayor probabilidad causó el daño**. Castro Ortiz v. Municipio, res. en 7 de diciembre de 1993; Pagán Rivera v. Municipio, 127 D.P.R. 538 (1990); Torres Ortiz v. Plá, 123 D.P.R. 637 (1989); Rodríguez Crespo v. Hernández, 121 D.P.R. 639 (1988); Cruz v. Centro Médico, 113 D.P.R. 719, 745 (1983); Pérez Cruz v. Hospital La Concepción, 115 D.P.R. 721, 740 (1984). **Colón Prieto satisfizo esta medida ("test") y probó la negligencia durante la operación.**

**Segundo**, reconocemos que el aquí **directamente** demandado es el Lcdo. Géigel y, Colón Prieto tiene que probar que tenía una causa de acción válida contra el Dr. Ark malograda por la negligencia del Lcdo. Géigel. "Esta exigencia peculiar, de perfiles propios, denominada por los tratadistas 'un caso dentro del caso' significa que 'el cliente debe establecer que él debió ganar el primer caso como paso previo para ganar el segundo'. J. Wade, The Attorney's Liability for Negligence en Professional Negligence (Roady & Andersen eds.), Tennessee, Vanderbilt Univ. Press, 1960, pág. 231. La necesidad de litigar el caso previo alegadamente frustrado para abrir las puertas al segundo implica ventilar todos los puntos y elementos clásicos de un proceso ordinario, con la única variante que, de hallarse probada la causa original, no podrá exigirse de la parte culposa resarcimiento. Simplemente habrá terminado el prólogo del proceso para entonces comenzar la segunda etapa e intentar establecer la responsabilidad del abogado." Colón Prieto v. Géigel, 115 D.P.R. 232, 242-243 (1984).

**La justicia es una avenida en dos direcciones**. Del mismo modo que el Lcdo. Géigel levantó numerosas defensas que propiamente correspondían al Dr. Ark –precisamente adujo que la demanda original contra el Dr. Ark estaba **prescrita**, planteamiento resuelto en su contra en Colón Prieto v. Géigel, supra–, en recta lógica Colón Prieto pudo beneficiarse y el

ilustrado tribunal de instancia justicieramente aplicar al caso de autos, la **doctrina de** <u>res ipsa loquitur</u>.[6] Expongamos sus contornos.

Como regla general, corresponde a todo demandante probar la actuación negligente de un médico demandado. La doctrina <u>res ipsa loquitur,</u> por excepción, **traslada** el

---

[6] En su elaborada sentencia, dicho foro concluyó:

"La prueba que le mereció entero crédito al Tribunal demuestra que toda la sintomatología de que se queja el demandante le proviene de la laceración de la lengua y que ésta se la ocasionó el Dr. Ark mientras le extraía los cordales. Si al llevar a cabo dicha extracción el Dr. Ark le ocasionó al demandante la referida laceración, **evidentemente que no ejerció el grado de cuidado, las destrezas y previsiones que la operación requería, pues no es usual que en operaciones de tal naturaleza se ocasionen lesiones al nervio lingual**. La prueba aportada por la parte demandante, que no fue desmentida ni impugnada por la parte demandada, demuestre que en operaciones de los cordales no son frecuentes las lesiones al nervio lingual. **Es decir, la falta de cuidado del Dr. Ark fue tan evidente, que la misma es suficiente para inferir que incurrió en negligencia mientras llevaba a cabo la extracción de los cordales**." (Énfasis nuestro).

peso de la prueba al médico, quien entonces debe demostrar que no actuó negligentemente. "[D]ispone que una vez el demandante establece los hechos que justifican su aplicación queda relevado de probar la negligencia del demandado, surgiendo en su lugar una inferencia permisible que pasa al demandado el peso de continuar con la prueba quien debe demostrar que empleó el debido cuidado." Herminio Brau del Toro, Daños y Perjuicios Extracontractuales de Puerto Rico, Vol. I, pág. 396.

Su aplicación requiere establecer los siguientes requisitos: 1) la existencia y circunstancias bajo las cuales se produjo un daño; 2) que éste no ocurra en el curso ordinario de los eventos a no ser por la **negligencia de otra persona quien tiene control exclusivo de la causa del daño**; 3) que circunstancialmente pueda inferirse razonablemente, que de no haber sido por la negligencia del demandado, el daño no hubiese ocurrido; 4) la prueba pericial para demostrar las causas del daño está bajo el control del demandado; 5) el daño no debe ocurrir por acción voluntaria del demandante; y 6) la inexistencia de otra causa probable del daño de la cual pueda inferirse que no hubo negligencia por parte del demandado. Hermida v. Feliciano, 62 D.P.R. 55 (1943). Sociedad de Gananciales Huyke Souffront v. Hospital Presbiteriano, 88 D.P.R. 391 (1963). Véase, Vda. de Torres v. Womble, 99 D.P.R. 859 (1971) y Ramos Orengo v. La Capital, 88 D.P.R. 315 (1963). Este último caso ejemplariza las siguientes situaciones específicas que no requieren prueba pericial para invocarla: 1) objetos dejados dentro del cuerpo; 2) **daño causado a una parte del cuerpo sana**; 3) **remoción de una parte sana del cuerpo**; y 4) dientes dejados por la tráquea del paciente, entre otros. José Cuevas Segarra, Res Ipsa Loquitur y los Casos de Impericia Médica, Revista Forum, julio-sept. 1991, págs. 22-23.

Bajo este sucinto análisis, el caso de autos es uno clásico al cual le aplica res ipsa loquitur. **Primero**, Colón Prieto sufrió un daño: la cortadura del nervio lingual que le insensibilizó la lengua y causó se la mordiera y lacerara. Esta laceración le produjo sensación de ardor y

tirantez en la lengua y otras lesiones posteriores. Antes de la operación, su lengua y sensibilidad era normales. Indiscutiblemente, el daño lo produjo el Dr. Ark al extraer los cordales: le cortó el nervio durante la intervención. **Segundo**, aunque probable, la cortadura de dicho nervio es un evento que **ordinariamente no sucede** (ni debe suceder) en una operación de cordales. En vista de que el daño ocurrió durante la operación, **estando Colón Prieto anestesiado**, el Dr. Ark tenía el **control exclusivo** de la situación. **Tercero**, si el Dr. Ark no hubiese cortado el nervio lingual, el paciente no se hubiese mordido ni lacerado la lengua. **Cuarto**, Colón Prieto en nada contribuyó al daño pues se encontraba anestesiado. **Aunque después, al morderse se laceró la lengua, esto fue en reacción al daño inicial ocasionado por el médico al darle muerte al nervio.** Es decir, cuando Colón Prieto se mordió la lengua, el daño ya existía.

En virtud de la doctrina de <u>res ipsa loquitur</u>, **se activó una inferencia de negligencia del Dr. Ark. Para rebatirla**, tenía que presentar prueba estableciendo que actuó con debido cuidado y la laceración y demás lesiones no fueron causadas por haberle cortado el nervio de la lengua a Colón Prieto. **No lo hizo; el daño habla por sí solo y su negligencia es incuestionable.**

C. <u>Negligencia Post-Operatoria</u>:-

Aparte de haberse probado **negligencia** durante la extracción –por **testimonio pericial directo** y la aplicación de la doctrina de <u>res ipsa loquitur</u>–, la Sentencia mayoritaria **acepta que posteriormente el Dr. Ark se apartó de las normas exigentes a los dentistas al nunca indicarle a Colón Prieto que le había lacerado el nervio lingual y debía visitar un neurocirujano.** (Pág. 12). Aun así, nuevamente lo eximen de responsabilidad bajo la tesis de que no estableció nexo de causalidad entre dicha negligencia y los daños que sufrió y continúa sufriendo. La mayoría se basa en que la prueba demostró que la práctica médica es esperar de seis (6) a un (1) año antes de intentar reparar un

nervio lingual y Colón Prieto, por su cuenta, visitó un **especialista** "dentro de este período". (Pág. 13). **Incide otra vez.**

**Primero**, el perito Dr. Stern aclaró que el término de seis (6) a un (1) año, era "un tiempo límite". O sea, **"sería el tiempo ideal para reparar el nervio**, pero hasta este tiempo era apropiado observar al paciente. (T.E., 246-247).

Así aclarado, quedó demostrado que desde el principio el Dr. Ark **ocultó a Colón Prieto la verdadera causa de la laceración: su propio descuido.** Durante los primeros cuatro (4) meses le dijo que los síntomas eran "normales". Pasados esos cuatro (4) meses, le informó que esperara cuatro (4) más y le advirtió la posibilidad de cortarle un pedazo de la lengua. Atemorizado, Colón Prieto decidió acudir donde el **dentista** Dr. Pesquera **a los once (11) meses de operado.** Todavía el Dr. Ark, en su carta fechada 19 de octubre de 1972 –**once (11) meses después de la operación**– al remitirle al Dr. Pesquera las placas de Rayos X, continuaba insistiendo en su increíble versión de que **"en el salón de recuperación el paciente [Colón Prieto] aparentemente se mordió el área anterior derecha de la lengua..."** (Énfasis original; traducción nuestra).

Ante esta situación, el Dr. Pesquera, que **no era especialista**, prudencialmente lo refirió al neurocirujano Ramírez de Arellano el 10 de noviembre de 1972, o sea, **al año exacto de la operación.**

Con vista a esta cronología, ¿cómo puede la mayoría premiar la omisión (por no decir mentira) del Dr. Ark  y concluir que no existe causalidad en los daños posteriores que aquejan a Colón Prieto?

Dieciocho (18) años después, el 17 de diciembre de 1990, en su testimonio judicial –no obstante existir consenso unánime en contrario de múltiples especialistas en y fuera de Puerto Rico– reiteraba lo **imposible;** que el corte de nervio no fue con sus manos durante la operación, sino resultado de **una mordida auto infligida.** (T.E., 125-126).

III

En resumen, el tribunal a quo determinó que el Dr. Ark, como dentista, incurrió en impericia profesional y causó un daño que hubiese justificado la imposición de responsabilidad civil. Correctamente expuso que el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, impone a los odontólogos un deber profesional idéntico al resto de la clase médica en general, lo cual conlleva ofrecer aquella atención que a la luz de los medios modernos de comunicación y conocimiento de la ciencia satisface las exigencias que la profesión reconoce para el tratamiento de padecimientos similares. Medina Santiago v. Vélez, 120 D.P.R. 380 (1988). Coincidimos plenamente. Al tribunal de instancia también **le mereció entero crédito** la prueba ofrecida por Colón Prieto de que todos sus padecimientos se han debido a la laceración de la lengua por el Dr. Ark. Éste, luego de ampararse en la confianza depositádale, atribuyó tal laceración a un **imposible**: mordida autoinfligida que eventualmente sanaría. No fue así. Esa demora, produjo incluso la advertencia de que sería necesario cortarle un pedazo de lengua.

**No existen fundamentos válidos para variar la conclusión de la ilustrada sala sentenciadora de que el Dr. Ark incurrió en un acto de impericia que generó a su vez una causa de acción meritoria a favor de Colón Prieto y, por ende, el Lcdo. Géigel es responsable.**

IV

Finalmente, los argumentos del Lcdo. Géigel en torno al señalamiento de error —evaluación en $60,000.00, más intereses, de los padecimientos de Colón Prieto y su esposa Nilda—, no ameritan mayor consideración. **Si acaso, el ilustrado Tribunal de instancia los estimó moderadamente.**

La discusión que hace en el último señalamiento, denota precisamente la temeridad que justificó la condena de $8,000.00 en honorarios de abogado.[7] Basta señalar, el lento y costoso peregrinaje

---

[7] Ramos Báez v. Bossolo López, res. en 13 de junio de 1997; Méndez de Rodríguez v. Morales Molina, res. en 15 de noviembre de 1996; Cándido Oliveras, Inc. v. Universal Insurance Company, res. en 7 de

judicial de Colón Prieto, que incluye el recurso de revisión del 1984 y la dilucidación en sus méritos, con prueba testifical y pericial, de "dos casos": el primero para demostrar la mala práctica del Dr. Ark y, el segundo, la del Lcdo. Géigel.

Como abogado, el Lcdo. Géigel tenía conocimiento del estado de derecho al celebrarse las vistas del caso en su fondo –días 8 y 9 de septiembre, 15 y 17 de diciembre de 1987, y 2 de marzo de 1988–, que culminaron con la justiciera y balanceada sentencia del tribunal de primera instancia. No puede ahora quejarse.

**Es lamentable que la mayoría, infundada e injustificadamente, la revoque.**

ANTONIO S. NEGRON GARCIA
Juez Asociado

---

noviembre de 1996; Corpak, Art Printing v. Ramallo Brothers, 125 D.P.R. 724 (1990) y casos allí citados.